UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                            Crim. No. 17-0691 MV

EDGAR GARCIA-GARIBAY,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Edgar Garcia-Garibay's Motion to Suppress Evidence, filed July 21, 2017 [Doc. 23], and Amended Motion to Suppress Evidence, filed January 8, 2018 [Doc. 39]. The Court held an evidentiary hearing on March 16, 2018. Having reviewed the briefs, testimony, exhibits, and relevant law, for the reasons below, the Court grants the Motion.

## BACKGROUND

This case concerns the interdiction of drugs at the Greyhound bus station in Albuquerque, New Mexico. The following represents the Court's findings of fact, based on the transcripts and photographic evidence submitted, as well as witness testimony.[1]

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) ..., the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

On February 15, 2017, Mr. Garcia-Garibay, 43 years old and a Mexican national, had traveled from Phoenix, Arizona, to Albuquerque by Greyhound bus. The bus began its journey in Los Angeles and had made numerous stops, including in Phoenix. The bus arrived a few minutes before 10:00 a.m. Mr. Garcia-Garibay disembarked, walked outside the station to the curbside area, and began using his phone to call an Uber ride. While he was standing outside the station and using his phone, he was approached by Drug Enforcement Agency (DEA) Special Agent (SA) Jerrell W. Perry.

SA Perry has been employed with the DEA for nearly twenty years. He specializes in intercepting the movement of drugs and proceeds from illegal narcotics on means of public transportation, such as buses and trains. SA Perry is particularly familiar with the travel routes of the Greyhound buses that pass through Albuquerque. On February 15, 2017, SA Perry was at the bus station waiting for the eastbound bus to arrive at 9:55 a.m.

On this particular day, SA Perry was accompanied by Task Force Officer (TFO) Clarence Davis. TFO Davis is employed by the Tribal Pojoaque Police Department and assigned to the drug task force at the DEA office in Albuquerque. He has over thirty years' experience in law enforcement, including extensive experience working on narcotics investigations. TFO Davis speaks Spanish. He learned Spanish from his grandparents while he was growing up, and during his tenure in the Albuquerque Police Department he tested as proficient in Spanish, earning him additional pay for his language skills. Furthermore, TFO Davis has taught classes in Spanish for immigrant communities on topics such as how to utilize and understand the role of law enforcement.

While Mr. Garcia-Garibay was standing outside the station, looking down at his cell phone, SA Perry approached. The Court had the benefit of listening to the audio recordings

made by the recording devices worn by SA Perry and TFO Davis. The first recording indicates that SA Perry introduced himself as a police officer, asked to see his ticket, asked about the purpose of his trip to Albuquerque, and asked for his identification. Immediately it became apparent to SA Perry that Mr. Garcia-Garibay was more comfortable speaking Spanish, so SA Perry, who speaks and understands some basic Spanish, switched to Spanish. Mr. Garcia-Garibay produced his ticket, stated that he was in Albuquerque for two or three days to set up business selling Herbalife products, and produced a border crossing card. SA Perry asked Mr. Garcia-Garibay where he was from in Mexico. SA Perry then asked if he had luggage and if he had any guns or weapons, to which Mr. Garcia-Garibay said no. SA Perry then asked, in Spanish, "[m]ay I check for contraband, sir?" to which Mr. Garcia-Garibay hesitated and said "I don't know . . . I don't know . . . how do you mean check?" At that point, SA Perry motioned to TFO Davis for help and said "Ok. I'm asking for permission to search him and he asked something that I don't know what he is saying. Can you translate for me?" TFO Davis then turned to Mr. Garcia-Garibay and explained that "the officer is asking for permission to check your baggage, for illegal items, sir, for drugs, weapons, explosives." Mr. Garcia-Garibay immediately responded that he did not have anything. TFO Davis continued to explain "[b]ecause we are conducting a security verification, because there are lots of armed individuals around . . ." The following dialogue then ensued, in which Mr. Garcia-Garibay declined permission for a search of his belongings 3 more times:

> Garcia-Garibay: I do understand that, but no, I don't have anything, guns, nothing of the sort. All is in order.
>
> TFO Davis: So, you don't, you don't want to give him permission?
>
> Garcia-Garibay: Well, no, I don't want to because, because just no . . . [chuckles] I don't know.

| | |
|---|---|
| TFO Davis: | [To SA Perry] He says he doesn't want to give permission. |
| SA Perry: | Ok. |
| TFO Davis: | Would you give me permission to put your package down and, and to look for a dog to sniff? |
| Garcia-Garibay: | Well, the thing is I don't understand why . . . I don't have any guns, nor weapons, nor nothing. |
| TFO Davis: | Well, how do we know that? |
| Garcia-Garibay: | Ok, how is it that . . . |
| TFO Davis: | Is it all right if, if a dog just sniffs your, your luggage? |
| Garcia-Garibay: | [chuckles] Well, ok, it's fine like that but what I don't understand. |
| TFO Davis: | He gave permission for a dog to sniff his . . . |
| Unidentified Voice: | Ok. |

[Ex. A1 at 73-85].

Before continuing to describe the encounter, the Court notes a concern about the audio recordings in this case. Although audio recordings are critically important to the Court's understanding of the encounter, the practice of turning the devices on and off during the encounter prevents the Court from knowing the precise duration of the encounter and leaves open the possibility that additional relevant interactions occurred while the devices were turned off. The duration of the encounter may also be indicative of the consensual or coercive dynamic of the encounter. Such concerns are present in this case. SA Perry and TFO Davis were each wearing a recording device. SA Perry testified briefly that it is common to turn the device off when they are merely waiting around, or if the officer is going to make a personal phone call, in order to conserve battery. [Tr. at 52:9-15]. However, it is conspicuous in this case that there were two periods of time in this encounter during which neither officer was recording. The first

4

period of unrecorded interaction was in between SA Perry's first tape [Ex. A1] and TFO Davis' first tape [Ex. B1]. The second period of unrecorded interaction was just after the officers and Mr. Garcia-Garibay went back inside the station and TFO Davis explained to SA Perry that Mr. Garcia-Garibay had asked to use the restroom (i.e. the end of Exs. A2 and B1). In light of the factual dispute regarding whether Mr. Garcia-Garibay went to the restroom during this period, and what may have occurred in the restroom, it is particularly problematic for the government's showing of voluntary consent that this period of the encounter was not recorded. In general, when officers turn their recording device on and off during an encounter, the Court is hindered in its desire to know how long the encounter lasted and if anything further was said during this time to prolong the encounter. SA Perry testified that the canine unit arrived ten to fifteen minutes after he called to request it. [Tr. at 24:12]. Without considering any time that may have lapsed in between recordings, the Court estimates that the canine unit was called about five minutes after the encounter began, and arrived at least 19 minutes after it was called. [Exs. A1, A2, A3, B1]. Again, without accounting for any amount of time in the restroom, the duration of the encounter, from when SA Perry first approached Mr. Garcia-Garibay to the arrest, was at least 27.5 minutes long. [Exs. A1, B1, B2]. Given that the agents apparently turned their recording devices off when there may have been a significant pause in the encounter, the Court assumes that it took over 20 minutes for the canine unit to arrive.[2]

After Mr. Garcia-Garibay had consented to a dog sniff, SA Perry asked Mr. Garcia-Garibay a few more questions about his visit to Albuquerque, with TFO Davis' translation, and then SA Perry asked to do a pat down search. Mr. Garcia-Garibay said "Well, okay, I mean, in any event, I don't have anything." SA Perry and TFO Davis again asked Mr. Garcia-Garibay if

---

[2] At the evidentiary hearing, the Court asked SA Perry about other possible evidence that could indicate the time when the arrest took place, such as a report prepared by the canine officer, but none has been identified or produced to the Court.

5

the bag he had with him was his luggage, and if the items inside belonged to him. Mr. Garcia-Garibay said "Yes, they are mine, everything is mine. It's my clothing and . . . look." There is a zipper sound on the recording, but no testimony indicating that Mr. Garcia-Garibay opened his bag. TFO Davis told Mr. Garcia-Garibay that they were going to call a dog.

SA Perry stepped aside and made a phone call to a nearby New Mexico State Police canine officer, requesting that he come to the station. Meanwhile, Mr. Garcia-Garibay continued to question their request to search, saying "But, that's funny, why, why do you want to check me?" [Ex. B1 at 39]. TFO Davis responded "No, as I said before, well, there are many that, that go through here, that have illegal things and that's why we are talking to many." *Id*. at 40. SA Perry then informed Mr. Garcia-Garibay and TFO Davis that the dog would arrive "in a few minutes," which TFO Davis translated to Mr. Garcia-Garibay as "the dog will be here soon, it's already, it's, it's coming." [Ex. A2 at 3-4].

TFO Davis then began to engage Mr. Garcia-Garibay in small talk. They talked about the weather, the bus ride, finding an affordable hotel room in Albuquerque, and Mr. Garcia-Garibay's experience using and selling Herbalife products. In the middle of the conversation, SA Perry asked again where he lived and for his identification. Mr. Garcia-Garibay commented in Spanish to TFO Davis, "it looks to me that the policeman is asking me, asking me because he thinks I'm something bad, right?" and "[i]t seems to me that because I didn't give permission he's going to go after me [chuckle]." [Ex. A2 at 51, 55]. TFO Davis deflected the comment and said "No, no, no. And how many times does, does a person have to drink Herbalife?" *Id*. at 56.

TFO Davis and Mr. Garcia-Garibay continued to make small talk about Herbalife, gang violence in Mexico, and TFO Davis' family in Mexico. SA Perry then said "Clarence, ask him if he is, if he is cold, he can, we can wait inside, if he wants to wait inside." *Id*. at 93. Mr. Garcia-

Garibay can then be heard to clearly ask "[c]an I go to the bathroom?" *Id.* at 97. TFO Davis said yes and pointed him in the direction of the bathroom. The recording then indicates that SA Perry whispered to TFO Davis "I've got my mic on . . . make sure he doesn't take anything out." [Ex. B1 at 142].[3] Both agents then turned off their recording devices. The Court has no evidence allowing it to assess how much time transpired while both devices were turned off. At the evidentiary hearing, Mr. Garcia-Garibay testified that SA Perry accompanied him into the bathroom, that SA Perry stood "really close by" to his left when he was using a urinal, and that he was leaning in towards him. [Tr. at 130:9-19]. Mr. Garcia Garibay testified that in response, he tried to lift his shirt and indicate that he was not concealing anything, and that SA Perry said something like "no, no." *Id.* at 19-24. He finished using the restroom and they exited. However, SA Perry and TFO Davis both testified that they had no recollection of Mr. Garcia-Garibay going into the restroom. [Tr. at 29:11; 81:25-82:2; 96:6-7; 97:18].

When the officers turned their recording devices back on, TFO Davis and Mr. Garcia-Garibay were back to talking about violence in Mexico, and personal health topics including smoking, jogging, and Herbalife. At one point TFO Davis said "If you want you can sit down sir, you don't have to . . ." to which Mr. Garcia-Garibay says "No, I've been sitting all day long." [Ex. A3 at 29-32]. SA Perry asked again to see Mr. Garcia-Garibay's identification. TFO Davis continued talking to Mr. Garcia-Garibay about Herbalife. SA Perry took the identification and called someone, a female by the name of Carmen, asking her to run some kind of database search for Mr. Garcia-Garibay. [Ex. A3 at 22-89]. During the phone call, SA Perry walked back towards TFO Davis and Mr. Garcia-Garibay, and the recording picked up more of the men's conversation as SA Perry walked towards them. SA Perry then said "Thank you Sir." *Id.* at 68. Given the agents' testimony that the ID was returned, and the fact that the government does not

---

[3] Oddly, at the evidentiary hearing, SA Perry denied hearing this statement on the recording. [Tr. at 48: 21].

7

have possession of the identification card, the Court interprets this part of the recording to indicate that when he said "Thank you Sir," SA Perry may have at that point returned the identification card to Mr. Garcia-Garibay. [Tr. at 55:4-12]. Mr. Garcia-Garibay testified that his visa card was never returned to him, and that "once I felt that they had my visa, which is what you use to travel with, I felt that I was under their control." [Tr. at 132:4-19]. However, Mr. Garcia-Garibay did acknowledge that SA Perry could have handed the visa back to him and that the visa could have been lost later, over the course of his processing. [Tr. at 154:3-10].

The conversation between TFO Davis and Mr. Garcia-Garibay then turned to economic opportunities in the United States as compared to Mexico. After a pause in the conversation, Mr. Garcia-Garibay and TFO had the following exchange:

| | |
|---|---|
| Mr. Garcia-Garibay: | And they can hold me here as long as the, as long as they want to? |
| TFO Davis: | What? |
| Mr. Garcia-Garibay: | So, can they hold me here as long as they want to, I mean, really, them, the police? |
| TFO Davis: | I don't understand. |
| Mr. Garcia-Garibay: | I mean, they, are they going to hold me here until a dog arrives to check the . . . ? |
| TFO Davis: | What? |
| Mr. Garcia-Garibay: | The guy. Are we going to wait for a dog until it gets here? |
| TFO Davis: | Yes, it's on its way. It'll be here shortly. It's almost here. |
| Mr. Garcia-Garibay: | Oh, ok. |
| TFO Davis: | And all it wants is to sniff your suitcase, your luggage. |
| SA Perry: | What did he say? |
| TFO Davis: | He asked if the dog was coming and I told him it was on the way. |

8

[Ex. B2 at 100-11]. At the evidentiary hearing, TFO Davis testified that he told Mr. Garcia-Garibay he did not have to stay there. [Tr. at 105:9]. The Court has considered the testimony and reviewed all audio recordings multiple times. The above exchange was captured clearly in Ex. B2, which is TFO Davis' recording device, and almost not at all on SA Perry's recording device, Ex. A3. At the evidentiary hearing, the government pointed out that in Ex. A3 at 100, you can hear what sounds like Mr. Garcia-Garibay faintly asking ". . . and do [I] have to stay here?"[4] and TFO Davis responding "no, no, no." The Court is unable to find that this small portion of Ex. A3 negates the exchange captured in Ex. B2. In particular, the last line in the exchange, "[h]e asked if the dog was coming and I told him it was on the way," appears at line 92 in Ex. A3. Accordingly, Mr. Garcia-Garibay's initial question must have been asked earlier in the Ex. A3 recording, and not at line 100. Furthermore, the question "and do I have to stay here?" and the reply "no, no, no" are not picked up in the recording in Ex. B2, so the Court is reluctant to attribute these statements to Mr. Garcia-Garibay and TFO Davis. The Court is troubled that line 100 of Ex. A3 lacks explanation, but because of its timing, it cannot contradict the exchange recorded in Ex. B2.

Moving on, SA Perry said he would call to follow up with the canine officer. [Ex. A3 at 90-93]. TFO Davis then, again, impressed upon Mr. Garcia-Garibay the security reasons for their desire to search, saying "Here at, at, at the bus and train, it's very different from the airplanes. Because at the airplanes they have the machinery and security all over and everything and at the bus and the train we just don't have it . . . then we have to do it with humans." [Ex. A3 at 94-98].

---

[4] The translation in Ex. A3 is "and do have to stay here?" However, because the original Spanish in the transcript as well as in the audio clearly includes the first person present verb "I have" (*tengo*) the Court has translated this line of the transcript to mean "and do I have to stay here?"

9

Only a few moments later, SA Perry announced that the canine unit was outside, and the three men went out to the curb to meet them. TFO Davis instructed Mr. Garcia-Garibay to put his bag down by the fence and to stand away from the dog. The dog alerted to the bag for the odor of illegal narcotics, and Mr. Garcia-Garibay was arrested. While he was being handcuffed, Mr. Garcia-Garibay said "Yes, yes. Well, fine. I do have, what's the use . . ." [Ex. A4 at 26].

At the DEA office in Albuquerque, TFO Davis brought a consent form, in Spanish, and explained it to Mr. Garcia-Garibay, saying "[t]his is a form that I'm asking for your permission to check your, your luggage. . . . because I think, like you told me, that you have drugs inside it," to which Mr. Garcia-Garibay responded "Yes." [Ex. B3 at 18-21]. TFO Davis explained that Mr. Garcia-Garibay had the right to decline consent at any time, and Mr. Garcia-Garibay signed the consent form. Officers then searched his bag and found three plastic-wrapped bundles containing methamphetamine.

## PROCEDURAL BACKGROUND

On March 14, 2017, Mr. Garcia-Garibay was charged in a one-count Indictment [Doc. 10] with Possession with Intent to Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). On July 21, 2017, he filed the instant Motion to Suppress [Doc. 23], arguing that his consent to the search was involuntary and coerced. On August 4, 2017, the United States filed a Response in opposition to Mr. Garcia-Garibay's Motion to Suppress. [Doc. 24]. On August 18, 2017, Mr. Garcia-Garibay filed a Reply to the United States' Response. [Doc. 26]. On January 8, 2018, Mr. Garcia-Garibay filed an Amended Motion to Suppress Evidence, explaining that additional transcripts/translations of the audio recording of the encounter were inadvertently not included in the original Motion. [Doc. 39]. The government responded to the Amended Motion on February

9, 2018, [Doc. 45], and Mr. Garcia-Garibay replied on February 21, 2018, [Doc. 48]. The Court held an evidentiary hearing on March 16, 2018, and took the Motion under advisement. SA Perry, TFO Davis and Mr. Garcia-Garibay testified at the hearing.

**STANDARD**

The Fourth Amendment protects "the right of the people to be secure in their . . . effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search implicating the Fourth Amendment occurs when the government invades a person's "legitimate expectation of privacy." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). A search undertaken without a warrant, subject only to a few, well-established exceptions, is *per se* unreasonable under the Fourth Amendment. A seizure implicating the Fourth Amendment occurs when the government meaningfully interferes with an individual's possessory interests in their property. *See, e.g., U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). When a defendant moves to suppress evidence obtained as a result of an allegedly unconstitutional search, he has the burden of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable. *See United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995).

Tenth Circuit law is clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *United States v. Lopez,* 443 F.3d 1280, 1283 (10th Cir. 2006) (quoting *Florida v. Bostick,* 501 U.S. 429, 434 (1991)) (internal quotation marks omitted). In *U.S. v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012), the Court summarizes the following:

> [A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [ ]he was not free to leave." *United States v. Fox,* 600 F.3d 1253, 1258 (10th Cir. 2010) (first alteration in original) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)) (internal quotation marks omitted); *see, e.g., United States v. Salas–Garcia,* 698 F.3d 1242,

1248 (10th Cir. 2012) ("A seizure occurs when 'a reasonable person would not feel free to leave or disregard the contact.'" (quoting *Lundstrom v. Romero,* 616 F.3d 1108, 1119 (10th Cir.2010))). "The critical inquiry is whether the police conduct would have communicated to a reasonable person that [ ]he was not at liberty to ignore the police presence and go about [his] business." *Fox,* 600 F.3d at 1258 (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382, 115 L.Ed.2d 389) (internal quotation marks omitted).

*See also United States v. Bostick*, 501 U.S. 429, 437 (1991) ("no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required."). The government bears "the burden of proving that consent is given freely and voluntarily." *Jones,* 701 F.3d at 1318 (citation omitted).

"Further, the question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Id.* (citation omitted). The *Bostick* Court deemed the following factors relevant to the Fourth Amendment reasonableness determination: (1) whether the agent advised the defendant he had the right to refuse consent, (2) whether the agent in any way threatened the defendant (*i.e.,* the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter. *Bostick*, 501 U.S. at 437. Following *Bostick,* the Tenth Circuit similarly identified various factors relevant to whether a reasonable person would not feel free to terminate an encounter with police:

> The threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*United States v. Hill,* 199 F.3d 1143, 1147–48 (10th Cir. 1999). The factors listed in *Hill* are not exhaustive. *See United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017); *Jones v.*

*Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005). Courts "'must consider all the circumstances surrounding the encounter' to determine whether consent was voluntary." *U.S. v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *Bostick*, 501 U.S. at 439). "A defendant's subjective state of mind may be relevant to some degree on the issue of the voluntariness of his or her consent, but it is not determinative if it does not overcome other indicia that the defendant's consent was freely and voluntarily given." *U.S. v. Huerta-Rodriguez*, 2010 WL 4929044, at *10 (D.N.M. Oct. 20, 2010) (Browning, J.) (citing *Hill*).

## DISCUSSION

SA Perry and TFO Davis attempted to conduct a consensual encounter. The Court has considered that the agents used non-aggressive tone, did not show their weapons, and that the interaction took place in an open, public space. However, several aspects of the encounter lead the Court to conclude that a reasonable person would not have felt free to leave. Accordingly, the Court finds that Mr. Garcia-Garibay's consent to a dog sniff was not voluntary and obtained in violation of the Fourth Amendment. The methamphetamine seized must be suppressed.

First, the officers made misleading statements about the purpose of the encounter. SA Perry initiated his conversation with Mr. Garcia-Garibay by saying that he was talking to people in the bus station for security purposes, and later asked him if he had any guns or weapons. [Ex. A1 at 2, 49, 55]. TFO Davis later made repeated references to Mr. Garcia-Garibay about safety and security, including potential terrorism. [Exs. A1 at 72, 126; B2 at 113-121]. Courts may consider misleading statements and behavior in favor of finding involuntary consent. Although "not all deception or trickery will render a search invalid," *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011), deception is appropriately considered part of the totality of the circumstances surrounding an encounter. This Court previously held in *United States v. Easley*,

13

Cr. No. 16-1089 MV, Doc. 49, at *22-25 (D.N.M. Jan. 10, 2018) (slip op.) (Vazquez, J.), that SA Perry's practice of stating that he is present for security purposes weighed in favor of finding coercion. The court in *United States v. Jimenez*, Cr. No. 17-2381 JCH, Doc. 56, at *5 (D.N.M. Feb. 7, 2018) (slip op.) (Herrera, J.), registered a different view that "drug interdiction is not an act that is separate and apart from ensuring security on buses, trains, or airplanes. In fact, drug interdiction is very much a part of the broader concept of security on public transportation because the use of public transportation for the conveyance of illegal substances invites various threats, including violence, to the traveling public." This Court is unable to assume that there is a causal relationship between carrying illegal drugs and unsafety. The Transportation Security Administration (TSA) checkpoints at airports confiscate illegal narcotics not because they pose a safety threat aboard an airplane but because they are checking for guns, explosives, and other weapons, which clearly pose a danger to security aboard an airplane. Confiscating illegal drugs is simply a collateral benefit of the checkpoints. When SA Perry and his colleagues approach passengers at the bus station, stating that they are checking the area for security purposes, a reasonable passenger would assume that the security concern pertains to guns, explosives, and other weapons, and may not realize that the officers are looking for other illegal contraband.

In this case, the officers' statements to Mr. Garcia-Garibay about security at the station were a particularly thinly veiled attempt to deceive Mr. Garcia-Garibay into providing consent, as Mr. Garcia-Garibay was attempting to leave the station when SA Perry approached him. He was standing outside the station, using his cell phone, and SA Perry learned after speaking with Mr. Garcia-Garibay for a few seconds that his destination was Albuquerque. From that point onwards, the officers' statements to Mr. Garcia-Garibay about maintaining security aboard buses and in the station were deceptive: if the officers were focused on interdicting weapons at the

14

station, they would not be concerned with a passenger attempting to leave the station with all of his belongings. Accordingly, in conjunction with other factors discussed below, the Court gives some weight to the officers' deceptive comments in favor of its finding that a reasonable person would not have felt free to leave. *Harrison*, 639 F.3d at 1278.

Second, at the outset of the encounter, Mr. Garcia-Garibay did, in fact, decline consent to be searched four times. [Ex. A1 at 71-83]. In particular, when Mr. Garcia-Garibay responded that he did not have anything in his bag, TFO Davis said "well, how do we know that?" *Id*. at 80. The Court is troubled by this tactic because, once Mr. Garcia-Garibay had refused consent to a search, the encounter began to devolve into an investigative detention that lacked reasonable suspicion. In *U.S. v. Fusci*, 986 F.2d 1430, 1430 (10th Cir. 1993), the Tenth Circuit specifically held that when the defendant refused to consent to a search of his luggage, the agent was no longer conducting a consensual encounter and the dog sniff, conducted without reasonable suspicion, was the product of an illegal seizure. In *Fusci*, the defendant was aboard an Amtrak train when he was questioned by an agent during a stop in Albuquerque. In response to the agent's questions, Mr. Fusci said he did not have drugs in his luggage, and he expressly refused to consent to a search of his luggage. However, the agent "continued questioning Mr. Fusci in an effort to seek another avenue to search his luggage[, and] Mr. Fusci eventually consented to a dog sniff of his luggage." *Id*. The Tenth Circuit noted that Mr. Fusci's consent to the dog sniff "came only after he had refused to consent to a search of his luggage" and, given that the agent lacked reasonable suspicion, the Court held that the dog sniff took place during an illegal seizure. *Id*.

Here, like *Fusci*, Mr. Garcia-Garibay declined consent to a search of his bag when he said he did not have any illegal items, and then said "[w]ell, no, I don't want to because, because just

no [giggles] because the truth, the truth is I don't know." [Ex. A1 at 75]. Background noise on the recording cuts off Mr. Garcia-Garibay's statement, but Mr. Garcia-Garibay can be heard declining consent twice, saying "well, no" and then "just no [giggles]." Having listened to the recording closely and repeatedly, the Court interprets Mr. Garcia-Garibay's "giggles" in the recording as nervousness, not laughter. Therefore, as in *Fusci*, because Mr. Garcia-Garibay declined consent to a luggage search, and because the agents were only attempting to conduct a consensual encounter, the encounter devolved into an investigatory detention without reasonable suspicion, making his consent to a dog sniff a product of an illegal seizure. *Fusci*, 986 F.2d at 1430.[5]

Even if the Court were to interpret Mr. Garcia-Garibay's remark of "I don't know," as indicating some ambivalence, the way the conversation unfolded made clear that Mr. Garcia-Garibay did not wish to consent to a dog sniff. First he said "[w]ell, the thing is I don't understand why . . . I don't have any guns, nor weapons nor nothing," to which TFO Davis responded "[w]ell, how do we know that?" *Id*. at 79-80. Just as the agent in *Fusci* ignored the decline of consent and persisted in asking for permission to do a dog sniff, TFO Davis ignored Mr. Garcia-Garibay's reluctance to consent and—by saying "[w]ell, how do we know that?"— clearly indicated to Mr. Garcia-Garibay that the agents would be suspicious of him if he declined

---

[5] The Court in *Fusci* also placed weight on factors not present in this case. In particular, the Court noted that "Mr. Fusci had engaged a private roomette [on the train, and that t]wo law enforcement officials were present when Mr. Fusci was questioned." *Fusci*, 986 F.2d 1430, 1993 WL 53106 at *2. The Court noted that having an encounter in a private setting can be more coercive than in a public setting where "a reasonable innocent person is less likely to feel singled out." *Id*. (quoted authority omitted). The Tenth Circuit in other cases has declined to follow *Fusci* where the assessment of the totality of the circumstances was distinguishable. *See, e.g.*, *U.S. v. Scudder*, 21 F.3d 1123, 1994 WL 144276, at *2, n.2 (10th Cir. 1994) (giving less weight to the location of the encounter being a private roommette on a train). This Court cites *Fusci* as persuasive authority for its finding that officers ignoring the defendant's decline of consent in order to persist in asking for consent to conduct a dog sniff weighs in favor of finding that an encounter was coercive. The Court weighs this factor in conjunction with others as part of its assessment of the totality of circumstances. *See Bostick*, 501 U.S. at 439–40 (finding that "[t]he Florida Supreme Court erred in adopting a *per se* rule" and that courts "must consider all the circumstances surrounding the encounter"). Because the totality of the circumstances in this case supports a finding of coercion, the Tenth Circuit's holding in *Fusci* is highly persuasive.

16

consent. When TFO Davis then asked again "[i]s it all right if, if a dog just sniffs your, your luggage?" Mr. Garcia-Garibay said, reluctantly, "[w]ell, ok, it's fine like that but what I don't understand." *Id*. at 82-83. Again, without acknowledging his clear reluctance, TFO Davis then immediately turns to SA Perry and says "he gave permission for a dog to sniff." *Id*. at 84. Because TFO Davis persisted in asking Mr. Garcia-Garibay to consent to a dog sniff even after he had repeatedly indicated that he wanted to decline consent, the Court weighs TFO Davis' persistence in favor of finding that a reasonable person would not have felt free to ignore the officers' requests and leave.

Third, when the three men went inside to stay warm, Mr. Garcia-Garibay asked to use the restroom. Regardless of the inconsistent testimony about whether Mr. Garcia-Garibay went into the restroom and whether SA Perry followed him into the restroom, the fact that Mr. Garcia-Garibay asked for permission to use the restroom corroborates the Court's interpretation that someone in Mr. Garcia-Garibay's position, having made several unsuccessful attempts to decline consent, would feel unable to leave.

Fourth, SA Perry asked for Mr. Garcia-Garibay's identification card once when he first approached Mr. Garcia-Garibay, and two more times while they were waiting for the canine unit to arrive. Prolonged retention of a person's identification is a factor courts consider in assessing the totality of the circumstances as to whether a reasonable person would feel free to leave. *See United States v. Hill,* 199 F.3d 1143, 1147–48 (10th Cir. 1999). The audio recordings do not clearly indicate how long SA Perry held onto the identification each time. The Court is presuming based on the testimony that in the first two instances, SA Perry returned the card to Mr. Garcia-Garibay right away. When SA Perry asked for his identification a third time, in order to place a phone call and run a database check, the Court estimates that SA Perry held onto the

17

card for around five and a half minutes. [Ex. A3 at 18-68]. The audio recording also indicates that SA Perry stepped away from Mr. Garcia-Garibay with the card when he made the phone call. Under these circumstances, having already asked to see the identification card twice before and then, upon asking for it a third time, stepping away for five minutes to place a phone call, the Court weighs SA Perry's handling of Mr. Garcia-Garibay's identification card as tending to convey to Mr. Garcia-Garibay that he was not free to leave. *See, U.S. v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995) ("Precedent clearly establishes that when law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter."); *U.S. v. Guerrero*, 472 F.3d 784, 786-87 (10th Cir. 2007) (holding that "[d]uring the time that [the officer] held [the defendants'] paperwork, [d]efendants were detained").

Finally, when Mr. Garcia-Garibay attempted to ask TFO Davis whether he had a right to leave, TFO Davis ignored the question and pretended not to understand. The Court considered the possibility that, as TFO Davis testified, he did not hear Mr. Garcia-Garibay's question, and finds this testimony to lack credibility. Mr. Garcia-Garibay's question is just as audible in the recording as his earlier statements throughout their conversation. Furthermore, during their earlier conversation, which lasted over 15 minutes, TFO Davis displayed a consistent understanding of Mr. Garcia-Garibay's Spanish. As defense counsel points out, TFO Davis even used the same verb that Mr. Garcia-Garibay used in his question, *detener*, when explaining to Mr. Garcia-Garibay at the time of his arrest that they would be detaining his bag. A reasonable person, having asked a question about his rights, and having his question ignored, would not feel that he was free to leave. *See Jones*, 701 F.3d at 1313 ("The critical inquiry is whether the police

conduct would have communicated to a reasonable person that [ ]he was not at liberty to ignore the police presence and go about [his] business.").[6]

No single factor is dispositive or receives extra weight in the Court's reasoning. Although the tone used and the location of the encounter were non-coercive, the Court is concerned in this case that (1) the officers made several misleading statements about the purpose of the encounter; (2) at the outset of the encounter, Mr. Garcia-Garibay did, in fact, decline consent to be searched four times; (3) when the three men went inside to stay warm, Mr. Garcia-Garibay asked to use the restroom; (4) SA Perry asked for Mr. Garcia-Garibay's identification three times, and in the third instance he stepped away with the card for over five minutes in order to conduct a records check; and (5) when Mr. Garcia-Garibay attempted to ask TFO Davis whether he had a right to leave, TFO Davis ignored the question and pretended not to understand. Under this set of circumstances, the Court finds that the encounter was coercive and that the government has not shown by a preponderance that Mr. Garcia-Garibay's consent was voluntarily given. *Jones,* 701 F.3d at 1318 (the government bears "the burden of proving that consent is given freely and voluntarily").

Accordingly, Mr. Garcia-Garibay's consent to a dog sniff of his bag was involuntary, making the dog sniff of his bag an unreasonable search under the Fourth Amendment. The methamphetamine discovered as a result of the search shall be suppressed.

---

[6] TFO Davis also twice deflected inquiries from Mr. Garcia-Garibay about the purpose of the encounter. *See* Exs. B1 at 39; A2 at 51, 55].

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Mr. Garcia-Garibay's Motion to Suppress [Docs. 23, 39] in its entirety.

Dated this 14th day of August, 2018.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Román Romero | Kimberly Brawley |
| *Attorney for Mr. Garcia-Garibay* | *Assistant United States Attorney* |